UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WARRIOR SPORTS, INC., and ATHLETE'S
CONNECTION, INC.,

        Plaintiffs,                        Case No. 08-14812

v.                                        HON. MARIANNE O. BATTANI

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

        Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### I.    INTRODUCTION

Before the Court is a motion for a preliminary injunction that Plaintiffs Warrior Sports and Athlete's Connection filed in the Western District of Michigan, before the case was transferred to this Court. (W.D. Mich. Doc. 12). After the case was transferred to this Court, Plaintiffs filed a motion for a preliminary injunction directly with this Court. (Doc. 5). For the reasons discussed below, Plaintiffs' original motion for a preliminary injunction is **DENIED**, and Plaintiffs' second motion for a preliminary injunction is **DENIED AS UNNECESSARY.**

### II.    STATEMENT OF FACTS

This case arises from a series of rule changes the National Collegiate Athletic Association (NCAA) implemented concerning the size of lacrosse sticks that may be

used in intercollegiate play.  Previously, any lacrosse head that was between 6.5" and 10.5" wide at its widest point and 10" "from the tip of the scoop to [the] front edge of the stop area" was permitted.  Originally, lacrosse sticks were triangular in shape, but the aforementioned restrictions permitted manufacturers to design sticks that were "pinched" such that they were narrower in certain spots.  The NCAA rules committee indicated that the pinched design was preventing the ball from being dislodged from the stick easily, and that this was resulting in injuries due to players' more aggressive attempts to dislodge the ball.  In September 2006, the NCAA rules committee changed the rules relating to lacrosse stick heads, effective January 1, 2009, as follows:

| **Measurement from throat of crosse** | **Minimum distance between narrowest point on the crosse** |
|---|---|
| 1.25" | 2.75" (all measurements) |
| 3" | 3.25" (all measurements) |
| 5" | 4.25" front and 3.5" back |
| The widest point | 6.5" front and 6" back |

Warrior Sports filed a lawsuit over these changes, but subsequently withdrew the suit when the NCAA agreed to reconsider the September 2006 rule change.  In September 2007, the NCAA rules committee adopted the following new rules, to be effective January 1, 2010:

| Measurement from throat of crosse | Minimum distance between narrowest point on the crosse |
|---|---|
| 1.25" | 3" (all measurements) |
| 3" | 3" (all measurements) |
| 5" | 4" front and 3.5" back |
| The widest point | 6.5" front and 6" back |

After adopting this rule, the NCAA allegedly learned that the rule's minimum dimensions tracked designs patented by Warrior Sports that covered stick heads that were narrower in the back then they were in the front.  The NCAA contacted Warrior Sports asking it to confirm that it had a patent covering such "flared" sticks and inquiring whether Warrior was "willing to provide other manufacturers with license to produce stick heads [that complied with the September 2007 rules] on reasonable and non-discriminatory terms."  The NCAA went on to advise Warrior that it reserved the right to amend the stick head specifications as it deemed appropriate.  Warrior informed the NCAA that it would not "agree in the abstract to licensing deals with all of its competitors."  Then, in February 2008, the NCAA adopted the following rule change, effective January 1, 2010:

| Measurement from throat of crosse | Minimum distance between narrowest point on the crosse |
|---|---|
| 1.25" | 3" (all measurements) |
| 3" | 3" (all measurements) |
| 5" | 3.5" - 4" front and 3.5" back |
| The widest point | 6" - 6.5" front and 6" back |

Dale Kohler, the general manager of Warrior Sports, asserts in an affidavit that all of Warrior Sports current lacrosse heads are illegal under the 2008 rule change. In addition, Kohler contends that Warrior Sports will be damaged by the devaluation of its patents, loss of sales, loss of market share, cost of developing a new product line, disposal and returns of current inventory, loss of customer goodwill, and loss of the benefit of its past marketing of the lacrosse heads that will become illegal. In order to provide lacrosse heads that comply with the rules in time for January 1, 2010, Warrior Sports will have to begin incurring costs associated with developing the new heads in October 2008, with the entire process from concept to mass production taking at least eight to ten months. Kohler claims that it will cost Warrior Sports "millions of dollars" to update its line of men's lacrosse heads to comply with the new rule. Kohler also asserts that the NCAA's rules are very influential because Major League Lacrosse, college athletic associations, the National Federation of State High School Associations (NFHS) and other high school associations, U.S. Lacrosse, and youth lacrosse associations usually adopt the NCAA lacrosse rules without any significant changes.

An affidavit from Kent Summers, an assistant director of the NFHS, was submitted by the NCAA. According to Summers, the NFHS is a non-profit corporation, whose members include the 50 state high school athletic associations. The NFHS member state associations are not required to adopt the rules and regulations promulgated by the NFHS and, typically, some state associations do not adopt NFHS rules without modifications. In July 2007, the NFHS discussed the 2006 NCAA lacrosse head rules revision and decided to take no action at that time. In July 2008, the NFHS considered a proposal to adopt, with a January 1, 2013 effective date, stick

4

specifications equivalent to the NCAA's September 2007 rule change. The proposal failed by a 5-1 margin. Summers stated that, at this time, "the NFHS has not adopted lacrosse stick head specifications equivalent to those adopted by the NCAA in either September 2007 or February 2008, and no such adoption is pending."

### III.     STANDARD OF REVIEW

A preliminary injunction is an extraordinary measure that the Sixth Circuit has characterized as "one of the most drastic tools in the arsenal of judicial remedies." Bonnell v. Lorenzo, 241 F.3d 800, 808 (6th Cir. 2001) (quotation omitted). Accordingly, it is the movant's burden to show that a preliminary injunction is necessary. See United States Student Ass'n Found. v. Land, 546 F.3d 373, 380 (6th Cir. 2008). In considering a motion for preliminary injunction, the Court must balance four factors:

> (1) whether the movant has a strong likelihood of success on the merits;
>
> (2) whether the movant would suffer irreparable injury without the injunction;
>
> (3) whether issuance of the injunction would cause substantial harm to others; and
>
> (4) whether the public interest would be served by the issuance of the injunction.

Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007).

**IV.     ANALYSIS**

*1.     Likelihood of success on the merits*

Section 1 of the Sherman Act states that, "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Sixth Circuit has held that the actions of the NCAA are subject to the Sherman Act when the NCAA's actions are "commercial in nature." Worldwide Basketball & Sport Tours, Inc. v. NCAA (Worldwide Basketball), 388 F.3d 955, 958 (6th Cir. 2004). For example, in NCAA v. Board of Regents of Univ. of Okla., the Supreme Court held that the NCAA's restriction of the number of televised football games violated the Sherman Act. 468 U.S. 85, 120 (1984). The Court also noted, however, "It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics." Id. at 117. The Court went on to distinguish the restriction on television broadcasts, which was at issue in that case, from, among other things, the "rules defining the conditions of the contest." Id. Likewise, in Worldwide Basketball, the Sixth Circuit held that an NCAA rule limiting the number of preseason tournaments a school's basketball team could participate in was commercial in nature because the rule "has some commercial impact insofar as it regulates games that constitute sources of revenue for both the member schools and the Promoters." 388 F.3d at 959.

The Sixth Circuit also recently reaffirmed this principle when it held that the NCAA's imposition of sanctions, which were a result of the coach's violation of NCAA recruiting and academic rules and made it difficult for a coach to obtain employment

6

with NCAA schools, did not constitute an antitrust violation. Bassett v. NCAA, 528 F.3d 426, 429 (6th Cir. 2008). In that case, the Sixth Circuit indicated that the NCAA's enforcement of these rules was not commercial activity because the rules "were intended to ensure fair competition in intercollegiate athletics." Id. at 433 (quoting Smith v. NCAA, 139 F.3d 180, 185 (3rd Cir. 1998) (holding that the NCAA's promulgation of eligibility rules is not subject to challenge under the Sherman Act because such rules are not related to the NCAA's commercial or business activities and primarily seek to ensure fair competition)).

Plaintiffs have not shown that they have a strong likelihood of success on the merits because they have not demonstrated that the NCAA's rule regarding the type of lacrosse equipment is "commercial in nature." See Worldwide Basketball, 388 F.3d at 958. There is no evidence that the NCAA engages in commercial or business activity relating to the sale of lacrosse sticks or that the rule otherwise relates to the NCAA's commercial or business activities. See Smith, 139 F.3d at 185. As such, the rule appears only to be directed towards increasing the quality of college lacrosse play and, thereby, enhancing interest in intercollegiate lacrosse. See Board of Regents of Univ. of Okla., 468 U.S. at 117 (stating that most of the NCAA's regulations are a "justifiable means of fostering competition among amateur athletic teams, [which] enhance[s] public interest in intercollegiate athletics"); see also Bassett, 528 F.3d at 429 (holding that the NCAA's enforcement of rules that were intended to insure fair competition in intercollegiate athletics was not commercial activity).

This case is analogous to Adidas America, Inc. v. NCAA, where the district court found that a NCAA bylaw prohibiting manufacturers' logos that were larger than a

specified size was noncommercial. 40 F.Supp.2d 1275, 1286 (D.Kan. 1999). The court first found that the bylaw had the noncommercial purposes of maintaining amateurism in NCAA athletics and insuring that player uniforms effectively performed their basic functions of allowing identification of players. Id. The court went on to find that the bylaw did not confer any direct economic benefit upon the NCAA because, even though the bylaw did not restrict "NCAA Football" logos, there was no evidence that the NCAA was a competitor in the sports apparel market. Id.

As in Adidas America, Inc., the rule in this case has noncommercial purposes in the form of the NCAA's desire to remedy the problem of it being too difficult to dislodge the ball from a competitor's lacrosse stick during play. In addition, there is no evidence either that the NCAA is a competitor in the lacrosse stick market or that the rule confers any direct commercial benefit upon the NCAA. Accordingly, because the rule is not commercial in nature, it is not subject to challenge under the Sherman Act. See Worldwide Basketball, 388 F.3d at 958.

Plaintiffs allege that the NCAA is retaliating against Warrior Sports for its unwillingness to license the patent it has that tracked the minimum stick requirements under the September 2007 rule change. There is, however, no direct evidence of such retaliation, and the circumstantial evidence is not strong enough to show that Plaintiffs claim will likely succeed.

Similarly, Plaintiffs contend that the NCAA may have created the February 2008 rule in collusion with Warrior Sports' competitors. If there was such collusion, a strong argument could be made that the rule was commercial in nature and, therefore, subject to the Sherman Act. But, Plaintiffs have no evidence of such collusion. Therefore,

Plaintiffs have not shown that they will likely succeed on the merits of their claim under Section 1 of the Sherman Act.

Plaintiffs also have failed to show that they will likely succeed on their tortuous interference claim.  "The elements of the tort of interference with an advantageous business relationship are (1) a valid business relationship (2) known to the defendant who (3) engaged in intentional conduct (4) causing the termination of that relationship resulting in (5) damages."  Ass'n Research & Dev. Corp. v. CNA Fin. Corp., 123 Mich. App. 162, 169 (Mich. Ct. App. 1983).  In order to make out such a claim, plaintiffs must show either an act that is *per se* unlawful or a lawful act done with a malicious and unlawful purpose.  CMI Int'l, Inc. v. Intermet Int'l Corp., 251 Mich. App. 125, 131 (Mich. Ct. App. 2002) (quotation omitted).  In this case, the NCAA's act of changing the rules relating to the dimensions of permissible lacrosse sticks is not *per se* unlawful.  See id.  In addition, for the reasons already discussed, Plaintiffs have not shown that the NCAA passed the rule in an effort to unlawfully or maliciously interfere with their business interests.  See id.

Finally, Plaintiffs have not shown that their promissory estoppel claim will likely succeed.  The elements of a promissory estoppel claim are:

(1) a promise,

(2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of promisee,

(3) which in fact produced reliance or forbearance of that nature, and

(4) in circumstances such that the promise must be enforced if injustice is to be avoided.

9

Ardt v. Titan Ins. Co., 233 Mich. App. 685, 692 (Mich. Ct. App. 1999).  In this case, Plaintiffs have not shown that the NCAA promised that it would not change its lacrosse stick head rules.  Accordingly, Plaintiffs have failed to show that their claims will likely succeed on the merits.

### 2. *Irreparable Injury*

Irreparable injury is injury so great that an award after litigation has concluded would be inadequate to fully compensate the injured party.  Aluminum Workers Int'l Union v. Consol. Aluminum Corp., 696 F.2d 437, 443 (6th Cir. 1982).  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90 (1974).  Furthermore, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 154 (6th Cir. 1991).

The NCAA argues that Plaintiffs act of not bringing this suit for roughly six months following the February 2008 rule change indicates that a preliminary injunction is not necessary.  The Sixth Circuit has viewed a Plaintiff's delay in bringing an action as evidence that the failure to issue an injunction would not cause irreparable harm.  See Forry, Inc. v. Neundorfer, Inc., 837 F.2d 259, 267 (6th Cir. 1988) (addressing the issue in the context of a copyright infringement action).  This is because such a delay demonstrates "that there is no apparent urgency to the request for injunctive relief."

High Tech Med. Instrumentation, Inc. v. New Age Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995). The NCAA points to NACCO Indus. v. Applica Inc., where a district court held that a delay of approximately one month in filing an action was convincing evidence that there was not irreparable harm. 2006 WL 3762090 at *8-*9, No. 06-3002 (N.D. Ohio, Dec. 20, 2006). In that case, however, it appears that the complaint was filed within weeks of the date on which the alleged irreparable harm would have resulted. See id. The Ninth Circuit, on the other hand, has held that a delay of four months should not be held against the plaintiff. See Gilder v. PGA Tour, Inc., 936 F.2d 417, 423 (9th Cir. 1991).

Although Plaintiffs did not file this suit as quickly as they could have, it does not appear that their delay should lead to an inference that there is no irreparable harm. Plaintiffs contend that they waited to file suit because they believed they could convince the NCAA to change the rule. In light of the fact that the February 2008 rule is the third version of the lacrosse stick rule since 2006, it appears that this was not an unreasonable belief on the part of Plaintiffs. In addition, this suit was still filed over a year before the rule's implementation and more than a month before Warrior Sports anticipated suffering any harm as a result of the rule change. As such, the Court will not view Plaintiffs' delay in filing this suit as evidence that a preliminary injunction is not needed to avoid irreparable injury. To find otherwise would discourage parties from fully exploring whether their disputes could be resolved without resorting to litigation.

Nevertheless, Plaintiffs have not shown that they will be irreparably harmed if an injunction is not entered. First, it is not clear that Plaintiffs will suffer a significant loss of customer goodwill when the NCAA requires participants in college lacrosse to begin

11

using sticks that comply with the new rules. Instead, it appears likely that any animosity their customers might feel would primarily be directed towards the NCAA, because it is their rule. Second, Warrior Sports claims that irreparable harm will occur because of (1) the loss of value of its patents and (2) the fact that no longer allowing the current "innovative and cutting edge lacrosse sticks and heads" to be used will damage lacrosse's popularity also fails. A preliminary injunction is not needed at this time in order to avoid these harms because they will not accrue in any significant form until the rule is implemented in January 1, 2010. See Michigan Coalition of Radioactive Material Users, Inc., 945 F.2d at 154.

Although Plaintiffs claim they will accrue costs in revamping their lacrosse stick product lines to comply with the 2008 rule, it appears that these costs will be necessary since Plaintiffs have been unable to show that their claims will likely succeed and, therefore, it appears that the 2008 rule will stand. See Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n, 110 F.3d 318, 334 (6th Cir. 1997) (stating that "where the harm to be suffered as a result of the issuance of a preliminary injunction is dependent upon the outcome of the litigation . . . it is within the district court's discretion to take the likely ultimate result of the underlying suit into consideration when assessing the harms"). Accordingly, the Court finds that Plaintiffs have not made a strong showing that they will be irreparably harmed if a preliminary injunction is not entered.

### 3. Harm to Others and the Public Interest

In light of the Plaintiffs's failure to show that they are likely to succeed on the merits of their claims, it appears that the issuance of an injunction would harm others

12

and not be in the public interest. In particular, the issuance of such an injunction would place the NCAA's lacrosse stick rules in a further, and apparently unnecessary, state of flux. Accordingly, the Court finds that the issuance of an injunction would harm others and be against the public interest in a situation such as this, where Plaintiffs have not shown that their claims would succeed on the merits and that they would be harmed by the Court's failure to issue an injunction.

**V.     CONCLUSION**

As discussed, Plaintiffs have not shown that they are likely to succeed on the merits of their claims because the NCAA's rule is not commercial in nature. In addition, Plaintiffs have not made a strong showing that they will suffer irreparable harm if a preliminary injunction is not issued. Furthermore, in light of, among other things, the fact that Plaintiffs appear unlikely to succeed on the merits of their claims, the issuance of a preliminary injunction would both harm others and not be in the public interest. Therefore, none of the factors the Court is to look to in issuing a preliminary injunction favor issuing such an injunction. See Certified Restoration Dry Cleaning Network, L.L.C., 511 F.3d at 542.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' original motion for a preliminary injunction, (W.D. Mich. Doc. 12), is **DENIED**. The second motion for a preliminary injunction, (Doc. 5), is **DENIED AS UNNECESSARY.**

>   s/Marianne O. Battani
>   MARIANNE O. BATTANI
>   UNITED STATES DISTRICT JUDGE

DATED: <u>January 30, 2009</u>

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

>   s/Bernadette M. Thebolt
>   DEPUTY CLERK